The Judges of the United States Court of Appeals Hear ye, hear ye. The United States Court of Appeals for the Sixth Circuit is now in session. All persons having business before this Honorable Court, draw near, give attention, and ye shall be heard. God save the United States and this Honorable Court. Please be Good morning. Would the clerk call the case please? Case number 21-3315 Salvatore Palma Jr et al v. Ashtabula County Ohio et al. Oral argument not to exceed 15 minutes per side. Mr. Perez for the appellants, you may proceed. Good morning, Your Honors. Good morning. My name is Richard Perez. I represent the plaintiff appellants in this matter. This is basically a 1983 action. If you wish to remove your civil rights action filed in the district court alleging excessive force in the shooting death of Vincent Palma, 26 years old. On February 8th, 2017, he was at his family's house in Geneva, Ohio. He had a dispute with his stepsister over a remote control. His mother had noticed some Ashtabula Police Department, excuse me, the Sheriff's Department to have him removed, possibly to be examined. About a half hour later, Deputy Johns from the Ashtabula Sheriff's Department arrives. He was dispatched with the notice that there was an unwanted person at the residence and that the person was code 76, which means code in the Sheriff's Department, which means that he's got mental issues. The family residence on about five acres has a long driveway from a state route 84 to the garage. The residence is slightly elevated. Johns pulls up in the driveway by himself. He drives down. Are you pursuing an excessive force claim? Yes. Okay, you didn't argue that in the district court, did you? Yes. Our whole argument was excessive force. Well, in your complaint, okay, so with respect to the tasing. The tasing, Mr. Johns was shot to death. He was shot nine times. Not with a taser. Pardon? Not with a taser. He was tased initially. I'll go through this, but he was tased initially. I know the facts. We all know the facts. All right, so the facts basically, you want me to skip the facts? No, we've read the briefs. We're very familiar with the facts. I'm just asking a legal question. All right. You didn't argue this in the case? We didn't argue that the force was excessive at that time on the taser. I think the tasing was unnecessary. He had not committed a crime. So we shouldn't be, something you don't argue in summary judgment, we shouldn't be considering as a claim in this court, correct? And you also didn't argue in your reply brief when your friends on the other side pointed out that you hadn't argued it at summary judgment. I think we argued in our reply brief in the Court of Appeals in the argument here that the tasing was unnecessary at that time. All Mr. Palma did is he walked down the driveway, as he had done one other time when police arrived, and he just walked out from the house all the way to the street. On this time, he was walking down the driveway. And as he was walking, he was ignoring the officer. I understand. I really, I get, I mean, it's a, the facts are important, but we've read all your briefs, so we understand. I just make, I don't think we should be considering your, your tasing argument about excessive force, because I don't think you argued it at summary judgment in the district court. And I think when your friend raised, on their side raised that, you didn't say anything about it in your reply brief in this court. Of course, each of us has our own views of the case, so we want to hear your argument here. Basically, with relation to the taser, as Mr. Palma walked down the driveway, as he had done before, Mr. Johns, the deputy, moved over to the right front of his vehicle. Mr. Palma was walking towards the left front of the cruiser, walking towards the road, ignoring the officer. The officer said, you know, show me your hands, stop walking. He didn't, so he tased him. He tased him, and when he tased him, he stood there when he tased him. The second time, he fell into a puddle. He had to get up from that puddle using his hands. I understand. I guess, I mean, I think, I think Judge Moran is saying the same thing. We understand your factual argument, but we're just, I'm just, I'm just making a legal point. Knowing, knowing, knowing the facts as we do, what about the facts amount, in your view, to, to excessive force? The officer claimed that the person was approaching him and he was told to take his hand out of his pocket to show his hands. And as I understand, he only showed one hand because one hand was used to pull the taser probes out of, out of himself. And, and, and, and then he got up from the ground from the tased position and, according to the officer, aggressively approached, got as close as maybe 10 feet, and I gave, I supposed the officer at that point was in fear of physical altercation with the individual. And that's when he claims he began to, to shoot to protect himself. Now, why was that excessive force? Well, you know, when you look at all the facts in this case, and you look what happened here, and you look at the fact that he had to get up after he was tased, and the officer should have been watching him at that point, he had to use two hands to get up. If he only used one hand to get up, in any event, there was no evidence of any weapons. This whole thing was, we don't know what Vincent was thinking at that time, but he never reached out, he never threatened, he never orally threatened, he never lurched at him, he never charged at him. He just continued to walk at him. Right, so between the tasing and the shooting, there was a long distance that was covered. Correct. If I understand it right, he was tased three times, he still gets up, and he follows him all the way across the yard with the officer walking backwards, repeatedly commanding him to stop, and he never stops. Correct. But he doesn't do anything. Well, he does do something. He follows him across the yard, does not, refuses the command, and keeps his hands in his pockets. Does that create a reasonable belief in the officer that he's going to have a coming or impending death or serious physical harm? Maybe he's afraid of physical harm. I hate to interrupt you, but let me ask you this. You're describing what occurred, which we already know, but what should the officer have done or was entitled to do to defend himself under those circumstances, which would not have constituted excessive force? Well, he had an ASP. What's that? He had an ASP. He had a baton. So when Vincent stopped, and according to the witnesses, you know, every time the officer would stop walking, Vincent would stop, according to Melissa and Vincent Palma, I mean, Salvador Palma. So he whipped out his ASP. You know, it's a two-foot metal piece of equipment. He flips it out. He could have used that. That isn't a piece of equipment that they use to subdue individuals. There's nothing here to indicate other than what he's thinking in his head, which is purely subjective, that Vincent is going to cause serious physical harm or death to him. Well, I mean, take into account that the officer didn't know the He was not responding to commands. He wouldn't stop approaching, as he was told to do. He wouldn't take his hands out of his pocket. Taking all that, as he was told, taking all that into account, and allegedly was told those things multiple times, wouldn't the officer be risking a hand-to-hand combat with this person during which he could have been injured or worst if he hadn't utilized his weapon? He may have been risking hand-to-hand combat, but hand-to-hand combat doesn't result typically in serious physical harm. It could. It might. It's a possibility. The issue here is whether he has probable cause to believe that he's got impending, imminent risk of serious physical harm, not physical harm, or death. Vincent did nothing to indicate that he wanted to attack him, nothing that he wanted to hurt him. He just walked. He just continued to walk. He didn't threaten him in any other way. Well, let me ask. So what you're saying is if there's going to be a physical altercation in terms of a fistfight or whatever else, the officer is obligated to go through that sort of ordeal and take that kind of risk instead of shooting? Well, officers know about a continuum of force, and they're trained to learn how to use different types of force. Deputy Johns, during his deposition, indicated that physical injury is not enough to use deadly force. He stated that himself. He knew that if Mr. Palm was code 56, he had a baton to defend himself. He could have used other means. He chose not to use other means. Officers on the street... Other than the baton, what other means could he have used? Well, he could have walked away. He could have moved away. All he did is... Wasn't he walking away for multiple minutes? Well, he'd been walking away for multiple minutes. Right, but he's moving back at a pace that he's not... Backwards, up a hill, walking backwards on a wet... Can I... I'm sorry. I don't want to... Just on a wet terrain, right? It's not... Yeah, it's really not up a hill. It's up a hill slightly from the driveway to for about 15 feet, and then it's pretty much level. If you were thinking about precedents, our precedents, what cases would you say are the best ones for your side? Well, I think the Mitchell case indicates that in that case, the individual was rushing towards the officer. He was threatening the officer. This case does not involve any threats whatsoever. It just involves walking. It doesn't... He didn't even make a remark. He didn't say, I'm going to hurt you. I'm going to kill you. I'm going to do anything. The officer's able to walk backwards without any issue, and Mr. Palma is just keeping pace with that, and then he stops, according to the witnesses, when the officer stops. Can I ask a question of different... Can I follow up on Judge Moore's question in a different way? What would have... What additional thing did Palma have to do to justify use of force by the officer? I think he would have had to at least reach out, say something, clinch his fist, do some activity. It looks like I'm going to hurt you. He did nothing. So your rule is there has to be a physical gesture, so not... Just let me... You'll get time. So your rule is that even if you're 10 feet away, and you've been disobeying commands for minutes, following the officer up a hill, you've been tased, and you still haven't stopped, you've disobeyed commands. Your rule is that you have to also have a physical gesture, another physical gesture towards the officer, and at that point, force is inappropriate. There has to be some indication of aggression, I think, other than walking, and there is no other indication here whatsoever. And is Mitchell your best case for that? Well, I mean, if you look at, you know, the case that's cited by the defense, the... I can't think of the name of it. I have it written down here. Out in Martinez, I believe, where, you know, in that case, that individual, the police encountered that individual, and he was kind of crazy, and they tried to handcuff him. He resisted, and they did put a handcuff on him. Then he had a handcuff on him, and he comes charging at the officers, but he hits one of the officers over the head, gashes his head. Then he comes back at the officers. He's unarmed. You're not saying all that. You're not saying all that has to happen before. No. These are acts of aggression. So I'm just trying to point out to the court that all these cases involve some act of aggression, and that just walking towards an officer, not using your hands, not threatening, not saying anything, not rushing the officer, but just a steady pace. You know, officers run into these encounters on the street all the time. If they shot everybody who did that, there'd be a lot more dead people than there are right now as a result. And you say in your reply brief, right, that there's no case directly on point? There's no case directly on point that we could find where there's no activity by a moving suspect. How does that juxtapose with the clearly established requirement? Well, I think the clearly established requirement basically says that if you are not in a right to shoot them, you know, to death. I mean, shooting somebody to death under these situations is the ultimate act of compliance. He could have done a number of other things. He could have used his asp if he felt the guy that Mr. Pommel was going to attack him, but he never, ever attacked him. So with respect to the clearly established argument, your best two cases are Mitchell and Martinez? At this point, that I can think of off the top of my head. I guess my best cases are there is no other case we could find where there is really no obvious act of aggression. And if we consider just walking towards somebody, mimicking somebody. We have cases that say that if you're 15 to 20 feet away from someone, you're an imminent threat because you can get there in seconds. We have cases that say that if you're within 15 or 20 feet of someone, you can reach them within a second or two. Right. I understand that. But in those cases, the individual is doing something aggressive. They're either charging, they're threatening. In this case, we didn't have any of that. We didn't have one statement from Mr. Palma. We didn't have one movement towards the officer from Mr. Palma. He was either mimicking the officer. He was being obstinate. I don't know what was going through his head at that time, but he did nothing for the officer to shoot at him. First, he shoots at him. According to the witnesses, he knew he was unarmed or he didn't see any weapons. Marissa Palma yelled out he's unarmed. He continued to shoot him after he shot him and he continued to walk and he shot him a number of other times. He's now on the ground. It's my understanding you can split these things up and look at the different activity. Now he's on the ground after he shot and he shoots him four more times. How many times total was he shot? Nine times. He shot two times as he's walking. He shot two times. I think it just grazed his legs. He then continued to walk. He then shot him three more times in the upper body. He then falls, hits the ground and as he's trying to get up and the Palmas indicated he was not lurching at the officer. He's already shot him all these times. He's down on the ground and he shoots him four more times. In fact, our ballistics expert indicated that most of those shots are downward so it would be when he's being shot. The shots are coming as he's down on the ground like that. I see your red light has been on so if you want to save your time for rebuttal that would be fine. I just have a red light. It will start. May it please the court. I'm Timothy Reed, counsel for the appellees. I don't think in this case that even the plaintiffs seriously contend that the tasing or the warnings were inappropriate or that was excessive force. And as Judge Polster pointed out in his opinion here, after being tased three times, no reasonable person would have continued to advance toward an officer but Vincent did. Put another way, at that point it was reasonable for Johns to consider Vincent a serious threat. You know, even though he had been tased, the officer had been advised in the language that was used was that this was someone with mental issues. So, Howard, to what extent should the officer have taken into account that this person was possibly mentally compromised? That's a good question, Judge. At that point in time, the officer has none of this background information that might have been provided. Well, no. I understand he was told over the dispatch that this was a situation with a person who allegedly, quote, had mental issues. So the officer was advised that this was a person who was not all there. And that's the extent of his knowledge. There is some other communication from the family through dispatch about bizarre activities and bipolar, et cetera, but the officer didn't know that. He didn't know that the man was schizophrenic and bipolar, which we subsequently have learned. But he was told that this was somebody with mental issues. Right. He was told that. And he was told to stay in the ground. He did not respond to that. So at that point in time, the officer is just part of the information he has. He knows there's a mental issue, but he doesn't know the extent of it. So you deal differently with someone who's got a mental issue than someone who's just refusing to respond to legal orders. And there's even a point in time, we talked about this a little bit, where the officer backs up and now he's called for backup. He's requested assistance and he does a second request for assistance. It's, could you get somebody here? At this point in time, it's clear that the officer is in physical fear. But why is he in physical fear, knowing that this is someone with mental issues and the person is simply not obeying his commands? It's because Vincent continues to advance on the officer. And we know from the documents here that the officer backed up about 30 feet from where he first was when he, when Vincent got closer to him. He backs up all the way to his car. He's in front of the car. And he even tries to put the car between the officer and Vincent. And at this point in time that Vincent gets up, the third case, he pulls the prong out with one hand and he's still advancing on the officer who's walking backwards while Vincent is moving forwards. According to one person's testimony, when the officer stopped, Vincent stopped. So that there was always a consistent distance or a minimum distance between the two. So don't we have to take that fact into consideration? Well, you also take into consideration at the point in time the taser is deployed and Vincent goes down, that's the time when the officer would use that period of time to handcuff Vincent, who's on the ground. The officer gets within about six feet, Vincent gets up, then the officer backs up. So it's a continuum of Vincent approaching the officer, keep coming after him. Suppose, suppose that instead of having mental health issues, Vincent was deaf. Wouldn't all of Vincent's actions be consistent with someone not hearing the officer say, stop? Well, most people when they're faced with the possibility of a taser, regardless of their mental capacity, stop. Most people when they're tased, stop. Whether they have mental issues or just are mad about something. Here's a situation where he's tased three times and doesn't stop. The only time that Vincent stopped here, and I understand what you're asking me is, didn't Vincent stop each time the officer stopped? There was one occasion where Vincent turned away from pursuing the officer and that's when the officer had his asp out, his baton. He did not strike him with it at that time because he thought, I'm not going to hit somebody in the back of the head when they're looking away. But his affidavit, in the affidavit, even the statements of the family say, Vincent took right back after him. So we get to the point where at some point in time the officer's retreating and he eventually retreats 107 feet from the car. 107 feet. It's an exhibit here and fortunately they were able to go out and mark some of these things because there was a snowstorm coming. But so we know it was 107 feet from the car to where the officer finally stopped. So what did the officer do and what were his other options? Well, one of the options, if he can't stop somebody from advancing, is to warn him that this is how people get shot. That's exactly what the officer did and as a matter of fact, according to the officer's affidavit and even the parents verify this, the officer fired warning shots before he actually fired at center mass. Officers are trained when they're trying to defend themselves to fire at center mass. He fires warning shots and you know, the parents here said this. This is the father's statement. Vinny kept coming at the officer. Officer drew his gun, told him to stop. Vinny kept coming. Officer shot the ground twice, told him to stop. Officer shot Vinny two or three times. He dropped Vinny, tried to get back up. Officer shot him some more. And Mrs. Palma says the same thing. There were warning shots fired. So at this point in time, the taser didn't stop Vincent from approaching the officer. The warnings to stop didn't stop. Would you concede that the behavior of the alleged victim was the behavior of someone who was not in his right mind? That seems to be what you're saying and what you're describing. It sounds as though you're almost conceding that a normally mentally endowed person would not behave in the way that the deceased did here. Right. So the effect on the officer is the same, whether the person's mentally disabled or is having a mental or emotional issue or if the the officer. It's the same impact on the officer. So when we look at these, and I know, for instance, the Mitchell case is an example. Is there some other explanation as to what could have been done to avoid this? And here, I think all the explanations are that at the point in time that actually Vincent was shot by the officer and even the first were down toward his legs. Well, you know, the officer had called for backup. Couldn't he, even if the officer, normally an officer, you don't expect to retreat from an altercation. But given the nature of the mental problems of the deceased, wouldn't it have been appropriate for the officer, even if he had to retreat from the situation physically, to do that until additional police personnel arrived on the scene where he could have had some help with this situation? Well, this is Ashley Biela County Judge, largest county area wise in the state of Ohio, with probably the fewest police presence in the state of Ohio. But at that point in time, the officer's affidavit says, and his testimony is, I can't back up from him as fast as he can approach me. So he's walking at me, but he's not stopping. But the officer could have gotten back in the patrol car. Well, at this point in time, the officer, you can see by the diagram. Isn't he 100 feet away from the patrol car? He's now, and by the way, isn't the individual between him and the patrol car at this point? Yes. So as the officer is backing away, as he's firing, he's still backing away. And so the question is, what happens after he fires? Does Vincent stop? And the testimony, even by the parents, their statements say, no, Vincent attempted to get up and lunge at him. And at this point in time, Vincent is close enough to the officer to reach him. So that's what the officer started shooting. I believe that once Vincent was within six feet of the officer, after the second tase, that the distance stayed between six to 10 feet all the way till the final shot. But the final shot was done when Vincent was still lunging at the officer. And the officer's affidavit and testimony is, he was within arm's reach of me. Now, what do you do with the autopsy report or the coroner's report indicating that the shots were fired downward? Well, we know that the testimony, the affidavit document, that Vincent was in what is described as a bear crawl, trying to reach the officer still. So presumably at that point, the officer can back up faster than a person can crawl. Well, the officer didn't feel that he had any option other than to shoot some more. He was not sure if he'd hit him with any of these shots or which shots hit him or which disabled. Many of the wounds are in the elbow, the arm. There's a grazing wound to the head. Interesting. What was the cause of death? Multiple gunshot wounds. But Vincent was alive when he was taken from there in an ambulance. So interestingly, one of the questions that Judge Polster asked us here during this case is, is somebody going to prove that the officer didn't have to keep shooting, that he was already completely disabled? There's no medical testimony saying that Vincent was completely disabled and that the officer didn't need to continue to shoot. The officer's testimony, and the parents verify this in their statements, is Vincent was still going after the officer. Officer John says, as soon as he stopped, I stopped shooting. He did reload his weapon, but he didn't shoot any further shots. He may not have been the best shot in the world if he shot 12 times and four or five of those just were wounds to the arms or the legs. So there were 12 shots total then? It looks like there were 12 shots. One hit a house somewhere, a neighbor's house. And we know that two, it looks like two were fired as warning shots that just went into the ground before Vincent was shot. This is all essentially one sequence of events. Right. Officers are trained to not just shoot one shot. They're trained to shoot in a group if they're trying to stop somebody. Frankly, I've never had a case where I could demonstrate that there are a lot of shots fired, but some of those shots were warning shots. I've never had a case where somebody had to retreat 107 feet just to protect themselves. What option? Go ahead. On the tasing, if you could help me on the facts, my understanding was that there is testimony that Officer Johns used his taser across the car to hit Vincent. Is that a correct statement of the facts? No. Actually, what happens is if we're using this podium as the vehicle, Johns is retreating in this fashion from the house as Vincent approaches him. He gets back right to the front of the car. And at that point in time, Johns thinks, well, maybe I could put the car between me and Vincent. But the shooting is in front of the car. The first taser is in front of the car. But I thought that there was another, there were three tasers. And I thought one of them, at least Mr. Palma or Ms. Palma say, was with the officer on the other side, the far side of the car from Vincent. Am I missing a fact? No, that's where the cartridges end up. When there's a taser shot, there's some things that come out of the taser that show where it was deployed. But here you can see the photographs. The second shot happened with the officer still trying to back up and get the front fender of the car between him and Vincent. And Vincent fell on the left side of the car. So at that point, the officer could have gotten into the car and driven back down the long driveway. But what the officer should do at that point in time is once you've tased somebody, the purpose is now you can handcuff them. Right. And I believe one of the parents said that Vincent was lying on the ground as a result of the taser for several minutes. It really was. Well. And we have to take the facts in the light favorable to Vincent. Sure, sure. And the officer's testimony is that as I approached him, I was about six feet away, and then Vincent got up. And then Vincent comes to the other side of the car. This didn't pose a threat to the officer. Right there, as the officer is now on the right side of the car, and Vincent approaches the officer, that's when the officer backed up away from the car. And I guess the question is, do we want to set a precedent that says, once you're dealing with somebody like this, get in your car and drive away? Or drive back a little way. As you point out, it's a rural area with a lot of land. Drive back a little bit and wait for backup. Knowing that this is a code 76, this is a mentally ill person who has not done anything in an aggressive fashion except walk towards the officer. Wasn't the officer called, though, because the mother felt that the family was in danger? And if the officer drives away, doesn't that put the family in danger from Palmer returning to the home and threatening them? The mother wants him out. The deposition testimony of the parents, if I may take a little more time to answer. The testimony of the parents at deposition is that Melissa said, he's getting out of here. I threw his, quote, shit out the door and said, you're gone. He's not coming back in. Was that told to the officer? We learn that later. So we have to look at what the officer knows when the officer comes to the house. So what exactly did dispatch say? We know dispatch said 76, which we know is mental health. But what else did dispatch say that the officer knew? That was it. The officer ran a check himself. It took him about 20 minutes to get to the house, by the way, if you look at the time sequence. So the officer ran a check himself and he pulled up Vincent's driver's license information, apparently. So when the officer got there, he had that information and nothing else. As you build a county, it could take another 20 minutes for somebody to get there. OK, but you've clarified then that the officer didn't know about Melissa wanting to get rid of Vincent from the house or anything else. All the officer knows, you say, is from dispatch, which is code 76 and information from Vincent's driver's license, which I, you haven't said, reveals anything particular. Right. What the officer knows at the point in time that Vincent doesn't stop and Vincent's coming at him and he's not obeying instructions and the officer deploys a taser, what the officer knows at that time, as pointed out by Judge Polster, no reasonable person would have continued to advance. The officer knows he's not dealing with a reasonable person, whether it's just Vincent's mentally unstable or he just doesn't know. But at this point in time, it's not a situation where all the alternatives aren't used by the officer to defuse the situation. When he arrived, he was trying to defuse the situation by saying to Vincent, how are you? What's going on? So at that point in time, do we apply 20-20 hindsight and say, the officer should have thought something different, he should have had better training and mental instability of people? I think the officer did everything he could reasonably be expected to do in this situation. Thank you. Thank you. Thank you. You know, we're not trying to win this case in front of the Court of Appeals at this point, but we believe the facts and circumstances here at least lead enough information in conflict that a jury should make this decision. The facts and circumstances here, and I just want to go through a few things real quick here. First of all, the officer was advised that this was an unwanted person and that he was 76, which indicates mental issues. Unwanted person? Unwanted person. Not wanted on the property? Correct. That's it. Wanted removed from the property? Correct. Because of potential threat to the people on the property? Because he was a threat. In fact, if you listen to what she told dispatch, she did not ever say he was a threat. So all, unfortunately, the dispatch information didn't go to the officer. They might have sent two officers at that point, like they did the last. But what did dispatch say to Officer Johns? All dispatch said is that unwanted person code 76. That's it. So the officer knows that he's code 76, however, which is their code for mental issues. Vincent was walking down the driveway as he'd done before. He basically ignored the officer. He walked to the driver's side. It's not accurate. I don't believe based on the evidence he's walking towards the car to the driver's side. The officer doesn't get him to stop. He moves over to the passenger side. Vincent, when he's shot, he falls next to a mud puddle that is almost parallel to the left front wheel of the vehicle. He's laying in that mud puddle. When he gets up, he then shoots him with another shock. At that point, he pulls the wires out and starts walking towards the officer. On the mental health issue, you think that cuts in your client's favor? I take it that the officer should have used some special standard of care? No. I think when you look at the totality of circumstances, you see a guy walking toward you, and he's not threatening you or anything like that. Maybe you think this guy's just a goof, and he's just walking toward you, mimicking you. I know it's obstructing, but you don't know that he's violent. You don't know any of that kind of stuff. He's been shot three times with a taser and still gotten up. Well, he's wearing a thick coat. So he's wearing a heavy, thick coat. I guess what I was really getting at is doesn't the mental health actually arguably create more fear for the officer that this person is quite... Can I just finish the point? That the individual's behavior is less predictable because of the mental health issues? No. I think it's a factor that can be taken either way. My point is this is an issue where a jury should be able to decide. So the mental health issue doesn't really cut either way? It can go either way. It could benefit us. It could not benefit us. And that's why... It kind of washes out. Pardon? It kind of washes out. Well, I think it provides facts to go either way. So I think it's an important issue that a jury might take into account as to what was going on here. He uses his hands to get up. He stops. And at one point when Vince stops, the officer whips out the ass. He doesn't do anything with it. He walks towards the officer. He never gets closer, according to the witnesses, between 10 foot plus. What do you think? Can I ask you one other question? The statement from the mother right after... Yeah. ...the event is pretty unequivocal that her stepson was constantly pursuing the officer. Right. Her statement a year and a half later during her deposition, obviously after he met with lawyers, was a little bit different, a little more favorable to your case. Correct. What do we do when the same witness gives conflicting testimony? That's typically not enough to survive summary judgment. Isn't that right? Well, again, that's an issue for the jury to decide. I'm saying I think it's a legal matter. You can't create an issue for the jury by conflicting your own... A plaintiff can't come in and say one set of events and then say another set of events and say, well, those conflicts, so there's an issue for the jury. Well, we know that she just watched her stepson got shot to death. She didn't believe that he should have been shot to death. She thought that he was initially being shot with rubber bullets. I don't know if they initially knew that he was killed at that point or was going to die shortly. So her comments, both comments that they made at that time were, you know, they both saw a traumatic event. They just want to get out of there. They want to get to their son. They're just quickly indicating what happened. And of course, what she saw was Vincent walking towards the officer. And that's basically what she said. She didn't say he was attacking him. He was trying to kill him. He was trying to hurt him. She didn't say any of that. And based on all that, I think a jury should be able to decide whether or not this officer had probable cause to believe that he was facing imminent, serious physical harm and death. And based on that, I really think that everything that we have here, the lack of threats, the no rushing, the slow pace, the gap that was between them, the opportunities the officer had to walk away from the scene rather than utilizing his gun to kill this guy. I mean. And I'm afraid your red light is on so that we need to conclude. Appreciate it. Thank you both for your argument. And the case will be submitted and the clerk may adjourn court. Dishonorable court is now adjourned.